(949 P.2d 628)
No. 77,111
BOARD OF COUNTY COMMISSIONERS OF NESS COUNTY,
KANSAS, *Appellant,* v. BANKOFF OIL COMPANY, *Appellee.*

Opinion filed November 14, 1997.

Larry D. Tittel, county attorney, for appellant.

Jack Glaves and Thomas M. Rhoads, of Glaves, Irby and Rhoads, of Wichita, for appellee.

Before MARQUARDT, P.J., ELLIOTT and PIERRON, JJ.

MARQUARDT, J.: The Board of County Commissioners of Ness County (Ness County) appeals from the decision of the district court which upheld the order of the Board of Tax Appeals (BOTA) that awarded Bankoff Oil Company (Bankoff) a partial refund of ad valorem taxes levied on an oil lease for the 1993 tax year. The question presented is whether BOTA erred in calculating the decline rate for the lease. This issue turns on whether oil production data for the period following the statutory valuation date was properly considered.

Bankoff operates an oil lease containing two wells in the Brownell field of the Cherokee Sand Reservoir, known as the Linden lease. Oil and gas operators are required to file an annual statement of assessment with the county appraiser in the county where the production exists. See K.S.A. 1996 Supp. 79-306; K.S.A. 79-332a. In February 1993, Bankoff filed the required statement for the Linden lease, showing that its fair market value was $3,357,045 and its assessed value was $1,007,114, with a 2 percent rate of depletion. Based upon a 2 percent rate of depletion, the county appraiser valued the lease at $3,361,222, with an assessed value of $1,008,367.

Later, Bankoff decided that the 2 percent depletion rate did not accurately reflect the actual decline in production. Bankoff filed a statement protesting payment of the ad valorem taxes, paid the

taxes under protest, and applied for a refund. In its tax protest, Bankoff stated that a major decline had developed in the fourth quarter of 1992 and that a comparison of the fourth quarter of 1992 to the first quarter of 1993 indicated a 51 percent decline, with a sustained decline of 40 percent in 1993. In a subsequent hearing, Bankoff presented evidence that the computer program it had used to calculate the initial decline percentages only evaluated annual declines and not quarter to quarter declines.

The 1993 Oil and Gas Appraisal Guide (PVD Guide) prepared by the Division of Property Valuation of the Kansas Department of Revenue provides, in part:

> "Producing a finite reserve results in a depleting asset. The rate of depletion is known as the decline rate. An oil reserve produced at its potential will theoretically begin to decline immediately. When a lease is new and just beginning its production, the decline rate is not known. The decline rate estimate depends on the age of the lease and cannot be predicted accurately until a reasonable length of time has passed. A history of the lease should be kept for this purpose.
>
> . . . .
>
> "No rules can be established to cover every facet. Decisions based on logical judgement and factual situations with similar leases in the general locale must prevail."

The PVD Guide provides the following guidelines:

> "A.  New Leases
>
>   . . . .
>
>   For leases that are less than one year old *and in cases where an annual decline rate cannot be calculated*, compute the annual decline rate by using back-to-back quarters, such as prior year last quarter with current year first quarter, and convert to an annual decline by using the following table. Requests should be accompanied by decline curves for as much history as is available.
>
>   . . . .
>
>   *When adjustment is requested by the operator for obvious abnormal sharp decline, it should be supported by data not only for the prior year demonstrating this decline, but production for the year of assessment.* A misapplication of the decline factor could result in extreme under or overappraisal of the lease.
>
>   . . . .

"B.   Existing Leases
To estimate the decline rate on an existing lease having stable production from year to year, the current year decline is figured by using the prior two production years. For the 1993 tax year, use 1992 and 1991 as follows:

Decline = $\dfrac{\text{1991 Production—1992 Production}}{\text{1991 Production}}$

. . . .

When using prior years' production to estimate the current [year decline], the appraiser must be sure that the production figures are for a full year and represent a typical operation with no significant workover periods or lease shutdowns or other nonproducing periods effecting the lease producing capability." (Emphasis added.)

At the initial BOTA hearing, the county appraiser testified that in determining the amount of decline, she looks at both the annual and historic decline. The decline curve that the county appraiser plotted on the Linden lease from its beginning in 1989 through the end of 1992 did not show a decline. The county appraiser compared the Linden lease's production in 1991 to that in 1992 and arrived at a 2 percent decline. At some point, the county appraiser examined the production figures for the first quarter of 1993; however, she testified that this information would not have changed her calculation because she had seen oil leases suffer a decline and then go back up and stabilize.

In a letter to BOTA dated August 29, 1994, the county appraiser stated: "When I work the present year renditions I do consider the first quarter of that year since it is available and it can indicate change, but at this point this lease had no indication of a fall in production."

At the initial BOTA hearing, Bankoff presented the testimony of Barney Sullivan, a tax consultant specializing in mineral properties. Sullivan stated that he had testified as an expert before BOTA many times and that he had been involved in the formulation of the PVD Guide. In calculating the decline rate of the Linden lease, Sullivan compared the last quarter of 1992 to the first quarter of 1993, arriving at a 16 percent decline for that period. Sullivan annualized this to a 50.2 percent decline. Sullivan's ra-

tionale for the decline calculations came from the PVD Guide, which Sullivan quoted as follows:

"For leases that are less than one year old *and in cases where an annual decline rate cannot be calculated,* compute the annual decline [rate] by using back-to-back quarters, such as prior year last quarter with current year first quarter, and convert to an annual decline by using the following table." (Emphasis added.)

Sullivan testified that this language applied both to new leases and to cases where an annual decline rate cannot be calculated and that the Linden lease fell under the second application. Sullivan testified further that it was "absolutely inappropriate" to use a comparison of the prior 2 years where a lease has a considerable decline. Sullivan agreed that if the decline rate on the Linden lease is figured by comparing the production in 1991 to that in 1992, then a 2 percent decline rate is indicated.

Bankoff also presented the testimony of Richard J. Flaker, a consulting petroleum engineer. Flaker testified that there are 14 wells in the Brownell field and that they all pump oil from a common source. Using exhibits and charts, Flaker showed that although production at Brownell field reached a sharp peak in August 1992, the Linden lease wells had a flat production from 1990 through October 1992. Flaker testified further that the Linden lease wells would have peaked with the rest of the Brownell field had they not been mechanically limited.

Flaker compared Linden lease's production for the last quarter of 1992 to the first quarter of 1993 and arrived at a 16 percent decline for that period. Flaker utilized data from the entire Brownell field as well as a similar field, known as the Jolly field, in determining the reasonableness and appropriateness of the 16 percent decline rate.

In its order initially affirming the county appraiser's assessment, BOTA stated:

"The county properly valued the subject property using the guidelines as established by PVD. The taxpayer argues that the PVD guidelines indicate that the county can use post valuation . . . data to value the property. The Board notes that the guidelines state that post valuation data may be used only in cases where the annual decline rate cannot be accurately calculated or if the lease is new. Here, the subject property has been producing oil for three full years prior to the

valuation date and a reliable production history had been established. The production history indicated that production had been fairly stable over the three year period and the county used the information available as of January 1, 1993, to value the property. Therefore, the county was not in error to refuse the taxpayer's request to use production data obtained after January 1, 1993. Furthermore, to deviate from the guidelines and value the subject property differently than other similar property in the area would violate the uniform and equal clause of the Kansas constitution. To explain, existing oil leases in the county should be valued as of January 1, 1993, using production information obtained in 1991 and 1992. If the county were to use 1993 production for this one lease only, then [it] would be valued differently than the other leases in the county and thus, not uniform and equal."

Bankoff filed a petition for reconsideration, which BOTA granted, and a second hearing was held. Bankoff presented the testimony of John R. Cooper, manager of the oil and gas section of the Kansas Department of Revenue. Cooper testified that the value of an oil and gas lease is the present value of its future production and that the theory of the PVD Guide was to appraise the reserves in the ground. Cooper testified further that the PVD Guide was not meant to limit the use of a comparison of the last quarter of the preceding year to the first quarter of the current year to new leases. In fact, it was Cooper's testimony that his office recommended using the data from the first quarter of the current year if a sharp decline is indicated that otherwise would not be indicated by comparing the previous 2 years. Cooper testified that the Linden lease took on the characteristics of a new lease because of its sharp decline. Cooper also testified that in evaluating the 1993 decline rate for the Linden lease, he would probably annualize the first quarter of 1993.

Cooper testified that while the method prescribed by the PVD Guide for valuing existing leases with stable production (the comparison of production for the 2 prior years) was useful in many cases, it would not be appropriate for certain leases. Cooper stated that this method only looks at two points on a curve and that it was not always "the last word" on the value of a lease.

Cooper testified that another way of calculating the decline is to look at the field generally and then compare that data to the lease in question. Bankoff presented evidence that the county appraiser

had assessed a 30 to 50 percent decline to most of the other leases in the Brownell field.

Following the second hearing, BOTA reversed its earlier decision, stating:

"After a review of all the evidence, the Board finds that using alternative methods of computing decline rates (including the consideration of current year production) has been advised by PVD for many years and is a common practice among appraisers, including the Ness County Appraiser. Accordingly, the Board finds the use of such techniques in this case does not violate the constitutional requirement of a uniform and equal basis for valuation."

BOTA found that "the most appropriate method for computing the decline rate of the subject property is the suggestion by Mr. Cooper to annualize the 1993 first quarter production and compare the result with the previous year's production." Using this method, BOTA calculated that the Linden lease had an 18 percent decline rate. Two BOTA members dissented, stating that they would affirm the county appraiser's valuation.

Ness County appealed BOTA's decision to the district court. The district court found that there was sufficient evidence to support BOTA's decision and that Ness County had failed to provide adequate grounds for reversing BOTA's decision.

Ness County argues that BOTA erred in using post-valuation data in figuring the decline rate for the Linden lease.

This court may grant relief under K.S.A. 77-621(c) if:

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

The party challenging an action taken by BOTA has the burden of proving that it was erroneous. *In re Tax Appeal of Scholastic Book Clubs, Inc.*, 260 Kan. 528, 536, 920 P.2d 947 (1996). "A ruling by BOTA on a subject within its area of expertise carries a strong

presumption of correctness." *In re Tax Refund Application of Affiliated Property Services, Inc.*, 19 Kan. App. 2d 247, 250, 870 P.2d 1343 (1993).

In the absence of evidence that an assessment was arrived at fraudulently, arbitrarily, or capriciously, neither a difference of opinion as to value nor an error in judgment by assessing officers is reason for interference by a court. *Cities Service Oil Co. v. Murphy*, 202 Kan. 282, 289, 447 P.2d 791 (1968). At the same time, courts have the authority to correct the acts of taxing officials where they have proceeded "without statutory authority or contrary to the statutes." *Mobil Oil Corporation v. Medcalf*, 207 Kan. 100, 103-04, 483 P.2d 1111 (1971).

Oil and gas leases, together with all producing wells, materials, and equipment, are assessed and taxed as personal property. K.S.A. 79-329; *Mobil Oil Corporation v. McHenry*, 200 Kan. 211, 224, 436 P.2d 982 (1968). K.S.A. 79-301 provides: "All tangible personal property subject to taxation shall be listed and assessed as of the first day of January each year in the name of the owner thereof." See *Palmer v. First Nat'l Bank of Kingman*, 10 Kan. App. 2d 84, 87, 692 P.2d 386 (1984).

K.S.A. 1996 Supp. 79-501 provides, in part: "Tangible personal property shall be appraised at its fair market value in money except as provided by K.S.A. 79-1439, and amendments thereto. All such real and tangible personal property shall be assessed at the rate prescribed by K.S.A. 79-1439, and amendments thereto." K.S.A. 1996 Supp. 79-1439(b)(2)(B) provides that mineral leasehold interests shall be assessed at 30 percent of fair market value. See *State ex rel. Stephan v. Martin*, 230 Kan. 747, 754, 641 P.2d 1011 (1982).

K.S.A. 1996 Supp. 79-503a defines fair market value as

"the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. For the purposes of this definition it will be assumed that consummation of a sale occurs as of January 1."

K.S.A. 1996 Supp. 79-503a provides the factors that are to be considered by county appraisers when determining fair market value,

one of which is sales. K.S.A. 79-331(a) provides specific factors for an appraiser to consider when determining the value of oil and gas leases. The objective of both K.S.A. 79-331 and K.S.A. 1996 Supp. 79-503a is to determine the actual fair market value of the property appraised. *Martin*, 230 Kan. at 755-56. In its reconsideration, BOTA did not address any of the other factors listed in the various statutes for determining actual fair market value; instead, it focused only on the decline rate, using the first quarter of 1993 to make its calculation.

The legislature has granted the director of property valuation the "ultimate supervisory responsibility for the administration of the assessment and tax laws of the state." *McManaman v. Board of County Commissioners*, 205 Kan. 118, 126, 468 P.2d 243 (1970); see K.S.A. 79-1401; K.S.A. 79-1404. In exercising this authority, the Division of Property Valuation has issued the PVD Guide. However, the PVD Guide is invalid to the extent it conflicts with the legislation that authorizes the tax. " 'Tax laws are statutory and do not exist apart from the statute. As such, they must be strictly construed.' " *Executive Aircraft Consulting, Inc. v. City of Newton*, 252 Kan. 421, 425, 845 P.2d 57 (1993). The PVD Guide is similar to a regulation issued by an administrative agency. Rules and regulations of an administrative agency that conflict with authorizing statutes are invalid. See *Pemco, Inc. v. Kansas Dept. of Revenue*, 258 Kan. 717, 720, 907 P.2d 863 (1995).

The practice of using data from the first quarter of the next tax year for personal property assessment violates the requirements of K.S.A. 79-301 that personal property be assessed as of January 1 of the tax year. Therefore, the procedures for using post-valuation data contained in the PVD Guide are invalid.

We reverse and remand with instructions that the district court reinstate BOTA's original finding of a 2 percent decline rate.

Reversed and remanded with instructions.

PIERRON, J., dissenting: I respectfully dissent. As pointed out in the majority opinion, the rulings of bodies such as the Board of Tax Appeals (BOTA) on subjects within their area of expertise carry

a strong presumption of correctness. The procedure set out in the PVD Guide to value oil and gas leases was adopted due to the well-known possibility of significant fluctuations in production over the short run, which can distort the true value of a lease.

The majority does not seem to dispute that the reason for checking production figures from beyond the tax year is logical, if the goal is to find the true value of the lease. Instead, it appears to rule that the statutes require us to ignore any information about production from subsequent quarters, because hypothetical buyers and sellers on the assessment date (January 1) would not have that information.

There appears to be nothing in the statutes or case law which would limit the *information* concerning the value of the lease on the target date to that generated in the tax year. In determining the value for a particular tax year, the PVD Guide uses the production figures for subsequent tax year quarters only for informational purposes, as they relate to the state of the reserves. As long as the figures are used for this purpose, they are not in conflict with the assessment statutes.

I fear this decision incorrectly denies the expertise of BOTA in this area and will force the implementation of a new assessment system that is less reliable and sometimes erratic. This approach is not required by the statutes.